IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATARZYNA GRONDECKI, et al. | : | CIVIL ACTION |
| | : | No. 12-6322 |
| v. | : | |
| | : | |
| AXIOM MANAGEMENT, INC. | : | |

O'NEILL, J.                                                                    January 28, 2016

**<u>MEMORANDUM</u>**

Plaintiffs Antoni and Irena Cyrkler[1] were passengers on a Pennsylvania-registered tour

bus owned by defendant Princeton Holdings, Inc., d/b/a Ameripol Tours,[2] which was involved

in a rollover accident in New York on August 3, 2011.  <u>See</u> Dkt. No. 48-1 at ECF p. 6; <u>see also</u>

Dkt. No. 45-8.  The Cyrklers reside in New Jersey.  Dkt. No. 1 at ¶ 8.  Defendant is incorporated

in Delaware with a principal place of business in Pennsylvania.  Dkt. No. 27 at ¶ 11.  The driver

of the bus at the time of the accident was licensed in Pennsylvania.  Dkt. No. 45-8 at ECF p. 15.

Now before me is a motion by defendant seeking summary judgment[3] on the Cyrklers' claims,

Dkt No. 45, the Cyrklers' response (Dkt. No. 47), defendant's reply (Dkt. No. 49), the Cyrklers'

supplemental exhibits (Dkt. No. 50) and defendant's response to the Cyrklers' supplemental

exhibits (Dkt. No. 52).  To decide defendant's motion, I must determine whether New York law

---

[1]     Although they have not been terminated as parties to the case, defendant contends that "the claims of the five other plaintiffs have been resolved."  Dkt. No. 45-1 at ECF p. 2.

[2]     Defendant contends that it is incorrectly designated in plaintiffs' complaint as Axiom Management, Inc.  Dkt No. 45-1 at ECF p. 1.  Plaintiffs do not dispute the contention.

[3]     While defendant's motion states that it is a motion to dismiss it includes a section titled, "Standards for Summary Judgment" and appends documents to its motion.  Accordingly, I informed the parties that I would consider the motion as one for summary judgment on October 7, 2015 (Dkt. No. 51) and provided the parties with an opportunity to file any additional papers they deemed necessary in accordance with Rule 12(d) of the Federal Rules of Civil Procedure. <u>See</u> Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.").

applies to plaintiffs' claims and, if so, whether a material question of fact remains with respect to whether plaintiffs are entitled to damages.  For the reasons that follow, I will grant defendant's motion.

## DISCUSSION

### I.    Choice of Law

I must first decide whether the substantive law of New York or Pennsylvania governs this action.  Defendant argues that New York law applies in this case.  Plaintiffs assert that Pennsylvania law should apply to their claims.  To answer a choice of law question, federal courts sitting in diversity are required to apply the choice of law rules of the forum state – in this case, Pennsylvania.  See Klaxon Co. v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 496 (1941).  Pennsylvania law begins the inquiry with a determination of whether the laws of the competing states actually differ.  Wilson v. Transp. Ins. Co., 889 A.2d 563, 571 (Pa. Super. Ct. 2005).

I find that there is an actual conflict between the relevant laws of New York and Pennsylvania.  Under the New York State Insurance Law, NY Insurance Law § 5101, et seq., which is commonly known as New York's No-Fault Insurance Law, no-fault insurers reimburse covered-persons for up to $50,000 in "basic economic loss" without proof of fault of the other driver.  NY Insurance Law § 5102(a).  A right of recovery for non-economic loss under New York law exists only "in the case of serious injury."[4]  N.Y. Ins. Law § 5104(a).

---

[4]    Under the No-Fault law, a serious injury is defined to include:

> a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing

Defendant argues that the relevant Pennsylvania law would be the Motor Vehicle

Financial Responsibility Law (MVFRL), 75 Pa. C.S. §§ 1701-1799.7.  <u>See</u> Dkt. No. 45-1 at ECF

p. 5.  Under the MVFRL, Pennsylvania is a choice-no-fault state where drivers can choose to be

insured under a "limited tort" plan or a "full tort" plan.  75 Pa. C.S. § 1705.  Under the limited

tort option, consumers, in exchange for a lower premium, generally waive their right to maintain

an action for any noneconomic loss except, inter alia, in the case of a "serious injury." [5]  75 Pa.

C.S. § 1705(d).  Plaintiffs contend, however, that the MVFRL's limited tort option and its

serious injury threshold for noneconomic damages do not apply to this case because the tort

options apply only to a "private passenger motor vehicle," defined as

> A four-wheel motor vehicle . . . which is insured by a natural
> person and 1) is a passenger car neither used as a public or livery
> conveyance nor rented to others; or 2) has a gross weight not

---

> substantially all of the material acts which constitute such person's
> usual and customary daily activities for not less than ninety days
> during the one hundred eighty days immediately following the
> occurrence of the injury or impairment.

N.Y. Ins. Law § 5102(d).

[5]    The MVFRL defines "serious injury" as "a personal injury resulting in death,
serious impairment of body function or permanent serious disfigurement."  75 Pa. C.S. § 1702.

> The "serious impairment of body function" threshold contains two
> inquiries:  a) What body function, if any, was impaired because of
> injuries sustained in a motor vehicle accident? b)  Was the
> impairment of the body function serious?  The focus of these
> inquiries is not on the injuries themselves, but on how the injuries
> affected a particular body function.  Generally, medical testimony
> will be needed to establish the existence, extent, and permanency
> of the impairment . . . .  In determining whether the impairment
> was serious, several factors should be considered:  the extent of the
> impairment, the length of time the impairment lasted, the treatment
> required to correct the impairment, and any other relevant factors.
> An impairment need not be permanent to be serious.

<u>Washington v. Baxter</u>, 719 A.2d 733, 740 (Pa. 1998).

exceeding 9,000 pounds and is not principally used for commercial purposes other than farming.

75 Pa. C.S. § 1702.  Plaintiffs argue that "[d]efendant's bus does not meet this definition. Among other reasons, it was insured by a corporation – not a natural person, it had a gross weight of 26,000 pounds, and it was principally used for commercial purposes."[6]  Dkt. No. 47 at ECF p. 15.  On this point, I agree with plaintiff.

Even if the MVFRL's limited tort option does not apply to this case, there is an actual conflict between the New York No-Fault law and Pennsylvania law, because unlike in New York, Pennsylvania law does not provide for automatic coverage without proof of fault for basic economic loss up to a threshold amount.  Accordingly, an "interest analysis" must be performed: consideration of the policies of all interested states and then – based on the result of the inquiry – characterization of the conflict as a true conflict, false conflict, or unprovided-for conflict. Budget Rent-A-Car Sys., Inc. v. Chappell, 407 F.3d 166, 170 (3d Cir. 2005).  A true conflict exists "when the governmental interests of both jurisdictions would be impaired if their law were not applied."  Id. (citation omitted).  If a true conflict exists, the Court must determine which state has the "greater interest in the application of its law," Cipolla v. Shaposka, 267 A.2d 854,

---

[6]    Plaintiffs also note that under the MVFRL,

[a]n individual who is not an owner of a currently registered private passenger motor vehicle and who is not a named insured or insured under any private passenger motor vehicle policy shall not be precluded from maintaining an action for noneconomic loss or economic loss sustained in a motor vehicle accident as the consequence of the fault of another person pursuant to applicable tort law.

75 Pa. C.S. § 1705(b)(3).  But in defendant's reply brief, it contends that "[d]uring their depositions the plaintiffs testified that they have a car that is registered and insured in their domicile state of New Jersey."  Dkt. No. 49 at ECF p. 2.

856 (Pa. 1970), by "'weigh[ing] the contacts on a qualitative scale according to their relation to

the policies and interests underlying the [particular] issue.'" Hammersmith v. TIG Ins. Co., 480

F.3d 220, 231 (3d Cir. 2007) (alteration in original), quoting Shields v. Consol. Rail Corp., 810

F.2d 397, 400 (3d Cir. 1987).  A false conflict exists if only "one jurisdiction's governmental

interests would be impaired by the application of the other jurisdiction's law."  Budget Rent-A-

Car, 407 F.3d at 170 (citation omitted); see also Wensley v. Scott, 459 F. Supp. 2d 388, 393

(W.D. Pa. 2006) ("in a false conflict, only one state is a 'concerned jurisdiction' that is, the state

is 'truly concerned with the result'), citing Kuchinic v. McCrory, 222 A.2d 897, 899-900 (Pa.

1966.  If there is a false conflict, the Court must apply the law of the only interested jurisdiction.

Budget Rent-A-Car, 407 F.3d at 170.  Finally, an unprovided-for conflict, arises when "no

jurisdiction's interests would be impaired if its laws were not applied."  Id.

 New York enacted its statutory no-fault insurance regime to "ensure prompt

compensation for losses incurred by accident victims without regard to fault or negligence [and]

to reduce the burden on the courts[.]"  Med. Soc'y of State of N.Y. v. Serio, 800 N.E.2d 728, 731

(N.Y. 2003).  Further, the New York Court of Appeals has recognized that the legislature

intended the No-Fault law "to weed out frivolous claims and limit recovery to significant

injuries."  Dufel v. Green, 647 N.E.2d 105, 107 (N.Y. 1995).  In Pennsylvania, "the MVFRL was

enacted to control the costs of automobile insurance, and also to address issues caused by

uninsured and underinsured motorists."  Kidd v. State Farm Mut. Auto. Ins. Co., No. 13-2625,

2015 WL 9479997, at *2 (M.D. Pa. Dec. 29, 2015), citing Lambert v. McClure, 595 A.2d 629,

631 (Pa. Super. 1991).  The MVFRL was meant to "provide protection for persons who suffer

injury arising out of the maintenance or use of a motor vehicle and are legally entitled to recover

damages therefor from owners or operators of underinsured motor vehicles."  Sherwood v.

Bankers Standard Ins., 621 A.2d 1015, 1017 (Pa. Super. Ct. 1993), rev'd on other grounds, 648 A.2d 1171 (Pa. 1994).

Defendant contends that in this case, there is a false conflict and the New York No-Fault law applies to plaintiff's claims "because Pennsylvania has no interest in utilizing its MVFRL to decide this action." Dkt. No. 45-1 at ECF p. 9; see also Dkt. No. 49 at ECF p. 3. Defendant argues that "New York's [g]overnmental interest would be severely impaired if . . . plaintiffs were able to maintain this action without proving a serious injury under New York Law" because "New York has a strong interest in ensuring out-of-staters are not fraudulently taking advantage of its regulatory regime by first taking advantage of its very generous first party . . . benefits and the[n] pursuing recovery in a third party action seeking payment for pain and suffering" under a different state's standard for what constitutes a serious injury. Dkt. No. 45-1 at ECF p. 9. Defendant notes that although plaintiffs contend that Pennsylvania law should apply to their claims, "[p]laintiffs elected to receive substantial benefits under New York's no-fault statute." Dkt. No. 49 at ECF p. 3.

Defendant also argues that Pennsylvania has no interest in this action "because Mr. and Mrs. Cyrkler did not hold any policy under Pennsylvania law, they did not live in Pennsylvania and had no contact with Pennsylvania." Id. Defendant asserts that "[a]side from [d]efendant['s] licensing, every other contact is with New York or New Jersey." Id. Accordingly, defendant argues that "[e]ven if this was a 'true conflict', New York has the strongest interest in applying its laws to the issues at hand" because

> [t]he incident occurred in New York. The place of injury was New York. The place of conduct was New York. The traffic laws that applied were New York's. The liability insurance trigger was in New York, New York no-fault damages were paid. Plaintiffs received treatment for their injuries in both New York and New Jersey. Plaintiffs began their trip in New Jersey and travelled to

>New York.  New York emergency personnel assisted Plaintiffs'
>after the crash.  Plaintiffs[ ] were not domiciled in Pennsylvania,
>they lived in New Jersey.

Id. at ECF p. 3-4.

Plaintiffs argue that Pennsylvania law should apply because Pennsylvania "is the only jurisdiction whose contacts are significant and directly related to the issue of the [d]efendant's liability to its passengers for damages" and claim that "New York has no connection to the parties or the issues, other than being the fortuitous location where the crash and the Plaintiffs' injuries happened to occur."  Dkt. No. 47 at ECF p. 17 (emphasis added).  Plaintiffs assert that "Pennsylvania has the strongest contacts with the parties and the strongest interest [in] applying its laws to the issues at hand."  Id. at ECF p. 18.  Plaintiffs note that defendant's principal place of business is Pennsylvania, the bus driver was licensed in Pennsylvania, the bus had Pennsylvania license plates and was insured under a policy issued in Pennsylvania.  Id. at ECF p. 12-13.  Plaintiffs argue that Pennsylvania has an "interest in ensuring that bus passengers are fully compensated for injuries and losses they sustain in crashes on buses that are registered, licensed and insured under Pennsylvania's laws."  Id. at ECF p. 15.  Plaintiffs also argue that defendant cites no "case in support of the proposition that receipt of first-party benefits under New York's no fault law necessitates the application of New York law in a subsequent tort action" and that "if the New York legislature intended for receipt of first party benefits to serve as a choice of law election, it could have included provisions to that effect in New York's statute," but it did not.  Id. at ECF p. 17.  Finally, plaintiffs argue that "Pennsylvania's interests would be significantly impaired if New York's No-Fault law applied to the case and defendant was able to escape liability if Plaintiff's injuries are not deemed 'serious' under the New York no-fault standard."  Id. at ECF p. 16.

Assuming arguendo that the conflict here is a false conflict, it is New York's interests which would be impaired by the application of Pennsylvania law.  "New York's serious injury threshold requirement (to reduce the number of litigated automobile personal injury cases and to reduce no-fault insurance premiums) would be eroded if [Pennsylvania] law were applied" in this case.  Kranzler v. Austin, 732 N.Y.S.2d 328, 329 (N.Y. App. Div. 2001) (declining to choose the New Jersey law over the law of New York where New Jersey law "allows the purchase of a no threshold option, for an increased premium, whereby the insured has no limitations on lawsuits and can sue for the noneconomic loss of pain and suffering for any injury, no matter how minor").  And even if there is a true conflict in this case, under the circumstances here present I agree with defendant that New York law should apply to plaintiffs' claims. Pennsylvania applies a hybrid approach in analyzing true conflicts of law.  "This 'hybrid approach combines both the Restatement (Second) of Conflicts approach (which looks to contacts establishing significant relationships) and an 'interest analysis' (a qualitative appraisal of the relevant states' policies)."  Esurance Ins. Servs., Inc. v. Weber, 30 F. Supp. 3d 351, 356 (E.D. Pa. 2014), citing Bearden v. Wyeth, 482 F. Supp. 2d 614, 619 (E.D. Pa. 2006).  The relevant inquiry is to determine the "extent to which one state, rather than another, has demonstrated, by reason of its policies and their connection and relevance to the matter in dispute, a priority interest in the application of its rule of law."  Bearden, 482 F. Supp. 2d at 619. Plaintiffs seek to recover for the injuries they claim to have suffered in the August 3, 2011 motor vehicle accident.  Accordingly, the relevant competing interests to consider are the interests that New York and Pennsylvania have in providing individuals injured in motor vehicle accidents with a right of recovery for their injuries, not the states' relative interests in their traffic laws or their regulations governing licensed drivers or registered vehicles.  See Talron Enters., Inc. v.

Garcia, 743 N.Y.S.2d 833, 638 (N.Y. App. Div. 2002) (determining whether to apply the law of New York or New Jersey and explaining that "the issue here is not whether [the driver] offended a rule of the road prescribed by New Jersey for motorists generally or some standard of conduct imposed by that jurisdiction.  Rather, the competing interests are really between the two no fault schemes of New Jersey and New York.").  Importantly here, plaintiffs have already made claims under New York's No-Fault Insurance provision and at least some of their medical bills have been paid for pursuant to New York law.  As defendant argues, New York has a "strong interest in ensuring out-of-state plaintiffs are not taking advantage of its generous no-fault law . . . ." Dkt. No. 49 at ECF p. 3.  Accordingly, I will apply the law of New York to plaintiffs' claims.

## II.    Summary Judgment

### A.    Standard of Review

Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23.  If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  A fact is "material" if it might affect the outcome of the case under governing law. Id.

To establish "that a fact cannot be or is genuinely disputed," a party must:

> (A) cit[e] to particular parts of materials in the record, including
> depositions, documents, electronically stored information,
> affidavits or declarations, stipulations (including those made for
> purposes of the motion only), admissions, interrogatory answers,
> or other materials; or
>
> (B) show[ ] that the materials cited do not establish the absence or
> presence of a genuine dispute, or that an adverse party cannot
> produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).  The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the movant.  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).

### B.  Serious Injury

Defendant argues that plaintiffs cannot sustain their claims for damages because their injuries do not qualify as "serious" under New York law.  Plaintiff disagrees.  Because I have decided that New York law applies to plaintiffs' claims, defendant's burden on summary judgment is to "submit admissible evidence demonstrating that a plaintiff did not sustain a serious injury" within the meaning of § 5102(d) of the New York Insurance Law.  "The defendant may satisfy this initial burden with unsworn reports by the plaintiff's physicians or with sworn affidavits or affirmations by the defendant's own retained physicians."  Thomas v. O'Brien, 08-3250, 2010 WL 785999, at *7 (E.D.N.Y. Feb. 26, 2010).

Relevant here are the following three types of serious injury under the New York No-Fault law:

> (1)    permanent consequential limitation of use of a body organ or member;
>
> (2)    significant limitation of use of a body function or system; and
>
> (3)    a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

N.Y. Ins. Law § 5102(d).

If defendant sets forth sufficient evidence to show that plaintiffs did not sustain a serious injury within the meaning of the statute, the burden shifts to plaintiffs to submit "competent medical evidence based upon objective medical findings and diagnostic tests to support [their] claims." Fitzmaurice v. Chase, 732 N.Y.S.2d 690, 692-93 (N.Y. App. Div. 2001) (citation and quotation omitted). "Plaintiff[s] must . . . offer admissible evidence in the form of sworn affidavits or reports by physicians, or sworn medical test records, such as MRI reports." Rivera v. United States, 10-5767, 2012 WL 3132667, at *10 (S.D.N.Y. July 31, 2012). "[U]nsworn letters or medical reports from physicians submitted by a plaintiff in opposition to a summary judgment motion are inadmissible evidence that may not be considered." Evans v. U.S., 978 F. Supp. 2d 148, 163 (E.D.N.Y. 2013).

With respect to the first type of injury, it is not enough that an injury is permanent, it must also be consequential. Kordana v. Pomellito, 503 N.Y.S.2d 198, 200 (N.Y. App. Div. 1986) ("In order to establish a permanent consequential limitation of use of a body organ or member, it is incumbent upon plaintiff to present competent evidence raising triable issues as to whether her injury was both permanent and consequential.") (emphasis added); see also Yeruham v. United States, No. 12-6389, 2015 WL 1966457, at *6 (E.D.N.Y. May 1, 2015)

("While permanent pain, even of an intermittent character, may form the basis of a serious injury, a plaintiff must provide objective medical evidence of the permanence of the pain and must show that the pain is of sufficient severity that it causes some form of physical limitation."). With respect to the second type of injury, "the word "significant" as used in the statute . . . should be construed to mean something more than a minor limitation of use."  Licari v. Elliott, 441 N.E.2d 1088, 1091 (N.Y. 1982).  "Whether a limitation of use or function is 'significant' or 'consequential' (i.e., important . . . ) relates to medical significance and involves a comparative determination of the degree or qualitative nature of an injury based on the normal function, purpose and use of the body part."  Toure v. Avis Rent A Car Sys., Inc., 774 N.E.2d 1197, 1201 (N.Y. 2002) (citations and alterations omitted).  Where a plaintiff claims serious injury arising from a "permanent consequential limitation of use of a body organ or member" or a "significant limitation of use of a body function or system," the plaintiff must submit "objectively measured and credible medical evidence."  Satterfield v. Maldonado, --- F. Supp. 3d ----, No. 14-0627, 2015 WL 5098103, at *14 (S.D.N.Y. Aug. 31, 2015).  "[A] serious injury under the 90/180 category [ – the third type of injury – ] also must be supported by objective medical evidence in admissible form establishing that the injury caused the alleged limitations in daily activity during the relevant time period."  Kavulak v. Laimis Juodzevicius, A.V. Inc., 994 F. Supp. 2d 337, 349 (W.D.N.Y. 2014).  To establish a serious injury under the 90/180 category, a plaintiff must demonstrate that he "has been curtailed from performing his usual activities to a great extent rather than some slight curtailment."  Licari, 441 N.E.2d at 1091.

"Permanent injuries already in existence at the time of the . . . accident will not qualify" as serious injuries.  Jones v. United States, 408 F. Supp. 2d 107, 117 (E.D.N.Y. 2006) (collecting cases).  However, "a strain that aggravates a preexisting degenerative condition can qualify as a

serious injury." Sanchez v. Travelers Cos., Inc., 658 F. Supp. 2d 499, 511 (W.D.N.Y. 2009).

"'[S]ummary dismissal of the complaint may be appropriate' where defendant has presented

persuasive evidence of pre-existing conditions, indicating a lack of a causal connection, and the

plaintiff has failed to address the defendant's causation argument." Alvarez v. E. Penn Mfg. Co.,

No. 10 -09541, 2012 WL 4094828, at *9 (S.D.N.Y. Sept. 17, 2012), quoting Pommells v. Perez,

830 N.E.2d 278, 281, 287 (N.Y. 2005) (emphasis omitted).  Also relevant here, "[p]roof of a

herniated disc, without additional objective medical evidence establishing that the accident

resulted in significant physical limitations, is not alone sufficient to establish a serious injury."

Pommells, 830 N.E.2d at 282; see also Kearse v. New York City Transit Auth., 789 N.Y.S.2d

281, 285 (N.Y. App. Div. 2005) ("the mere existence of a bulging or herniated disc is not

evidence of a serious injury in the absence of objective evidence of the extent of the alleged

physical limitations resulting from the disc injury and its duration").

    For the reasons that follow I find that plaintiffs have not met their burden under New

York law to rebut defendant's showing that they did not sustain serious injuries as a result of the

bus accident.  Thus I will grant defendant's motion for summary judgment.

### 1.    Permanent or Significant Injuries:  Antoni Cyrkler

#### a.    Physical Injuries:  Antoni Cyrkler

    Mr. Cyrkler claims that he injured his back and left leg in the bus accident.  See Dkt. No.

45-3 at ECF p. 4.  Defendant asserts that Mr. Cyrkler, "a 58 year-old laborer who has painted for

most of his adult life," has a history of pre-existing back conditions including degenerative disc

disease. Dkt. No. 45-1 at ECF p. 11.  Defendant argues that "Mr. Cyrkler's degenerative disc

disease diagnosis undercuts his serious injury argument."  Id. at ECF p. 13.  Plaintiff contends

that none of the injuries Mr. Cyrkler sustained in the crash were conditions for which he had

received prior medical attention.  Dkt. No. 47 at ECF p. 3.

After the accident, on August 8, 2011, Mr. Cyrkler was seen by Dr. Bozena Bitner for the chief complaint of "[l]ow back pain after bus accident."  Dkt. No. 48-2 at ECF p. 26.  Mr. Cyrkler complained of "[l]ow back pain[, s]harp pain in lumbar area, has been gradually getting worse."  Id.  Upon examination, however, Mr. Cyrkler exhibited "normal sacroiliac joint mobility bilaterally. . . .  [N]ormal curvature of spine, mild pelvic obliquity. . . . [N]o vertebral spine tenderness, no paraspinal tenderness, no sacroiliac joint tenderness."  Id.  Mr. Cyrkler was referred for an MRI and instructed to apply a "heating pad to affected areas 2 to 3 times a day." Id. at ECF p. 27.

On August 19, 2011, Mr. Cyrkler underwent an MRI.  As reported by The Radiology Center, Mr. Cyrkler had a clinical history of "progressive low back pain," and the MRI showed "moderate disc degeneration with loss of disc signal and disc height at L4-5.  There is broad base disc protrusion reducing canal diameter narrowing both neural foramina and clinical correlation of both L4 nerve roots, especially on the left," additionally, "at L5-S1 there is disc degeneration with broad disc protrusion and marginal osteophytosis resulting in right greater than left foraminal narrowing and clinical correlation advised regarding the status of both L5 nerve roots especially on the right."  Dkt. No. 45-3 at ECF p. 11; Dkt. No. 48-2 at ECF p. 30.  Also, the MRI showed "disc degeneration with moderate diffuse broad base disc protrusion and left greater than right neural foraminal narrowing at L4-5" and "[d]isc degeneration with broad disc protrusion and marginal osteophytosis with right greater than left neural foraminal narrowing at L5-S1" Dkt. No. 48-2 at ECF p. 29.  There was "[n]o evidence of fracture/dislocation, marrow replacing process or intraspinal/paraspinous mass."  Id.  Considering x-rays of Mr. Cyrkler's left leg, the radiologist found "no acute evidence of acute fracture or significant focal osseous lesion," rather,

the x-ray showed a "short segment smooth periosteal reaction on the proximal shaft of the tibia which is probably associated with a chronic stress fracture which is likely to represent response to a chronic, healed stress fracture requiring clinical correlation." Dkt. No. 45-3 at ECF p. 12.

On August 27, 2011, Mr. Cyrkler was seen by Dr. Kwapniewski where he complained of "lower back pain, difficulty bending, also pain [left] shin, nodule [sic]." Dkt. No. 48-3 at ECF p. 2. Upon examination, Mr. Cyrkler was observed to have "l[ef]t shin painful nodule – mid portion" and a "normal range of motion all joints, no swelling or deformity." Id. He was given a diagnosis of "lumbago," referred to an orthopedic surgeon and given injections of triamcinolone acetonide, vitamin B-12 and ketorolac tromethamine in his back. Id. at ECF p. 2-3.

Mr. Cyrkler followed up with Dr. Kwapniewski on August 29, 2011, "complaining of pain located in the lumbar area." Id. at ECF p. 4. Dr. Kwapiniewski's notes state that "[t]he pain began few days ago. The pain occurred without any precipitating event or trauma. . . . Radiographic findings include disc bulging, disc degeneration, L3/4, L4/5. Id. (emphasis added). An examination of his lumbar spine/lower back showed "no obvious deformity. . . . [L]imited range of motion in all directions; standing forward exaggerated lordosis. . . . [N]o vertebral spine tenderness, paraspinal spasm appreciated." Id. at ECF p. 5. He was prescribed Naprosyn (a pain reliever), Volataren gel and Robaxin (a muscle relaxant). Id. He also received a second set of injections.

Mr. Cyrkler received a third set of injections on August 30, 2011. Id. at ECF p. 11. He was still complaining of "low back pain although injections helped a lot." Id. at ECF p. 6. Also on August 30, 2011, Mr. Cyrkler received an initial evaluation from a physical therapist and a treatment plan for physical therapy, ultrasound and electrical stimulation for four weeks, three times per week. Id. at ECF p. 10-15.

After beginning physical therapy, Mr. Cyrkler returned to Dr. Bitner on September 12, 2011 complaining of "low back pain[, s]harp pain in lumbar area, has been gradually getting worse." Id. at ECF p. 27.  On examination, he had "normal sacroiliac joint mobility bilaterally, . . . normal curvature of spine, mild pelvic obliquity[,] . . . no vertebral spine tenderness, no paraspinal tenderness, no sacroiliac joint tenderness" and his gait was "normal." Id.  Mr. Cyrkler was given a "work ex[c]use slip" and told to apply a "heating pad to affected areas 2 to 3 times a day." Id. at ECF p. 28.

On September 28, 2011, Mr. Cyrkler was seen for an orthopedic consultation by Dr. Kent S. Lerner.[7] Id. at ECF p. 30.  At the time, he was "complaining of lower back pain and pain in his left leg.  He states the back is more problematic." Id.  Dr. Lerner wrote that Mr. Cyrkler "has no previous problems with his lower back." Id.  On examination, Mr. Cyrkler had "tenderness across the low back, forward flexes until the fingertips come only to the level of the knees and can go no further."  According to Dr. Lerner the August 19 MRI showed "mild to moderate disc protrusion at L3-4 and a lot of disc degeneration at L5-S1." Id. at ECF p. 31.  His impression was that Mr. Cyrkler was "[s]tatus post high energy trauma to the lumbar spine superimposed upon previously asymptomatic degenerative disc disease and contusion to the left leg." Id.  He agreed that Mr. Cyrkler should receive physical therapy "to focus on stretching and range of motion" and prescribed a three day course of Cyclobenzaprine followed by a six day course of Methylprednisone. Id.

On October 12, 2011, after Mr. Cyrkler saw Dr. Lerner again, Dr. Lerner reported that he

---

[7]      Dr. Lerner's initial report is provided on letterhead, but is unsigned.  Dkt. No. 48-3 at ECF p. 30-31.  His subsequent letters are also unsigned and are not on letterhead.  Dkt. No. 48-3 at ECF p. 33; Dkt. No. 48-4 at ECF p. 2, 21.  None of Dr. Lerner's reports are sworn.  Nor are any of the other medical reports which plaintiffs have submitted to the court pertaining to either Mr. or Mrs. Cyrkler.  I note also that plaintiffs have not submitted an affidavit from Dr. Lerner or from any of the other physicians who treated either Mr. Cyrkler or Mrs. Cyrkler.

was "feeling somewhat better since he was placed on the muscle relaxant and short course of oral steroids." Id. at ECF p. 33.  On examination, "[t]he patient now forward flexes until the fingertips come within six inches of the floor . . . ." Id.  Continued physical therapy was prescribed. Id.  Dr. Lerner again prescribed physical therapy on November 9, 2011, when he saw Mr. Cyrkler "overall seems to be improving" and "can forward flex until his fingertips come about 4-5 inches from the floor and he is ambulating with a more fluid gait pattern."  Dkt. No. 48-4 at ECF p. 2.  After 12 additional sessions of physical therapy between January 3, 2012 and March 2, 2012, id. at ECF p. 5-19, Dr. Lerner re-examined Mr. Cyrkler on March 7, 2012, concluding that he had "reached maximum medi[c]al improvement from his Orthopaedic care." Id. at ECF p. 21.  Dr. Lerner also stated that it was his "opinion, based upon a reasonable degree of medical probability, the patient has sustained permanent injury to his lumbar spine as a result of the Accident of August 3, 2011." Id.

　　　Finally, on June 12, 2015, more than three years after Mr. Cyrkler last sought medical treatment, he was evaluated by Dr. Guy W. Fried, who was not his treating physician.[8]  Upon examination, Dr. Fried found that Mr. Cyrkler "had tenderness over his lumbar facet joints,"

---

[8]　　　Defendant argues that "Mr. Cyrkler was last treated nearly three years ago" and the gap in treatment undercuts his serious injury argument.  Dkt. No. 45-1 at ECF p. 13.  Plaintiff responds that Mr. Cyrkler testified "that he was uninsured and lacked the financial resources to continue treatment" and that "Dr. Lerner (and his physical therapist) concluded that Mr. Cyrkler had reached maximum medical improvement and should only return if there were a chance in his circumstances."  Dkt. No. 47 at ECF p. 23.  Defendant responds that "Mr. Cyrkler has more than enough financial resources to continue treatment because he still has over $25,000 left in unused [personal injury protection] benefits" under the No-Fault law.  Dkt. No. 49 at ECF p. 8.

"While a cessation of treatment is not dispositive . . . a plaintiff who terminates therapeutic measures following the accident . . . must offer some reasonable explanation for having done so."  Pommells v. Perez, 830 N.E.2d 278, 283 (N.Y. 2005).  While the discontinuance of benefits may constitute such an explanation, this is not the case where, as here, plaintiff provides no "proof that he was treated until No-Fault would not pay for further therapy."  Satterfield v. Maldonado, --- F. Supp. 3d ----, No. 14-0627, 2015 WL 5098103, at *13 (S.D.N.Y. Aug. 31, 2015).

"palpable paraspinal spasms in his back and neck . . . [and] decreased range of cervical and lumbar range of motion."  Dkt. No. 50-2 at ECF p. 9.  Dr. Fried concluded that Mr. Cyrkler "has quantified decreased cervical and lumbar range of motion with significant spasm" and that "[h]e would benefit from periodic physical therapy and intervention to treat his pain."  Id.  His report states that "[a]s the patient's symptoms have been present for nearly four years, I conclude that they are permanent."[9]  Id.

Defendant argues that the "diagnostic studies establish that [Mr. Cyrkler] did not sustain any acute injury in this accident to his back, neck or leg."  Dkt. No. 45-1 at ECF p. 12. Defendant also contends that Mr. Cyrkler "has not presented any evidence relating his degenerative disc injuries to the accident, rather than to his pre-existing condition."  Id. at ECF p. 11.  Finally, defendant argues that while "Mr. Cyrkler's medical records contain references to disc herniations," they are "devoid of both quantitative and qualitative evidence comparing his limitations to his normal functions."  Id. at ECF p. 12.

In response, plaintiffs argue that "[i]f [Mr. Cyrkler's] degenerative disc disease was asymptomatic prior to the bus crash, then the pain and reduced range of motion he suffered following the bush crash would constitute an exacerbation of this degenerative disc disease and qualify as a serious injury under the threshold analysis."  Dkt. No. 47 at ECF p. 21.  Plaintiff provides the Court only with this conditional "if" statement and does not point to objective evidence to support a finding that Mr. Cyrkler's degenerative disc disease was, in fact,

---

[9]    I note that Dr. Fried's report is not affirmed in accordance with the requirements of Rule 2106 of the New York Civil Practice Law and Rules.  See N.Y. C.P.L.R. 2106 (McKinney) ("The statement of . . . a physician, osteopath or dentist, authorized by law to practice in the state, who is not a party to an action, when subscribed and affirmed by him to be true under the penalties of perjury, may be served or filed in the action in lieu of and with the same force and effect as an affidavit.").

asymptomatic prior to the accident.

First, I note that there are questions as to whether any of the medical evidence upon which plaintiffs rely to rebut defendant's argument that Mr. Cyrkler has not sustained a serious injury is competent to demonstrate a serious injury.[10]  See Evans v. United States, 978 F. Supp. 2d 148, 163 (E.D.N.Y. 2013) (finding that "unsworn letters or medical reports . . . are inadmissible evidence that may not be considered"); Robinson v. United States, No. 02-5166, 2005 WL 747039, at *6 (S.D.N.Y. Mar. 31, 2005) (finding no triable issue of fact where the "[p]laintiffs have offered only unsworn medical reports in the form of Dr. Augustyniak's examination notes, physical therapy notes, and MRI reports [and i]t is well established that unsworn medical reports are not a form of admissible evidence capable of demonstrating a serious injury"); Molina v. United States, 301 F. Supp. 2d 317, 321 (S.D.N.Y. 2004) ("evidence of Molina's bulging discs is inadmissible because it is based solely upon an unsworn report from a doctor who has not submitted a sworn affidavit or otherwise participated in this litigation"). Further, even if I can consider as competent any of the evidence which plaintiffs have submitted to the Court, without more, Dr. Lerner's conclusion that Mr. Cyrkler "sustained permanent injury to his lumbar spine as a result of the accident of August 3, 2011" Dkt. No. 48-4 at ECF p. 21 (emphasis added), is not sufficient to support Mr. Cyrkler's claim that he sustained a serious physical injury.  Nor is the similar conclusion of Dr. Fried.  Dkt. No. 50-2 at ECF p. 9.  "Absent an explanation of the basis for concluding that the injury was caused by the accident, as opposed to other possibilities evidenced in the record, an expert's conclusion that plaintiff's condition is causally related to the subject accident is mere speculation, insufficient to support a finding that

---

[10]        "[A]ttached reports to physician affidavits including unsworn MRI reports interpreted by the physician's affidavit are considered admissible evidence," Evans v. United States, 978 F. Supp. 2d 148, 163 (E.D.N.Y. 2013), but the medical reports which plaintiffs have submitted to the Court are not attached to any physician's affidavit.

such a causal link exists." Valentin v. Pomilla, 873 N.Y.S.2d 537, 539 (N.Y. App. Div. 2009).

I note that "plaintiff has not provided any expert report [or other objective medical evidence] that

explains why [Mr. Cyrkler's] pre-existing conditions are not the cause of his current injuries."

Satterfield v. Maldonado, --- F. Supp. 3d ----, No. 14-0627, 2015 WL 5098103, at *12 (S.D.N.Y.

Aug. 31, 2015). Moreover, it is not enough to show simply that Mr. Cyrkler suffered a

permanent injury. The injury must also be consequential – or if not permanent and

consequential, then the injury must be significant. See Nasrallah v. Helio De, No. 96-8727, 1998

WL 152568, at *7 (S.D.N.Y. Apr. 2, 1998) ("a plaintiff's physician's conclusory statements as to

significance or permanence, unsupported by facts detailing the extent of the limitation, is

insufficient"). Mr. Cyrkler's subjective complaints of post-accident physical limitations are not

sufficient to support a conclusion that the claimed injury to his spine rises to the level of an

injury which has had an important or significant effect on his ability to function when compared

to his abilities prior to the accident. On the record before me, I find that plaintiffs have not set

forth sufficient evidence for a jury to find that the accident at issue caused Mr. Cyrkler to sustain

a physical injury which is either permanent and consequential or significantly limiting within the

meaning of § 5102(d) of the New York Insurance Law.

### b. Mental Injuries:  Antoni Cyrkler

Mr. Cyrkler also claims that he has "felt upset and depressed since the crash" and that a

"psychotherapist has diagnosed [him] with post traumatic stress disorder as a result of the crash."

Dkt. No. 45-3 at ECF p. 4. He testified that he saw a psychologist "[b]ecause I had nightmares"

and because he has fear "[r]iding in a car or driving a car in the rain." Dkt. No. 45-4 at 24:22-

25:14.  Following the accident, Mr. Cyrkler was evaluated by Alicja Krzych Klauber,[11] a

licensed clinical social worker.  Based on her consultation, she diagnosed Mr. Cyrkler with

"PTSD with features of anxiety with depression," and recommended weekly psychotherapy

sessions  Dkt. No. 48-5 at ECF p. 7.  On October 28, 2011, Ms. Klauber reported that Mr.

Cyrkler was "[r]esponding to treatment" and planned to decrease their visits to bi-monthly.  Id. at

ECF p. 10.  In December 2011, Mr. Cyrkler "appeared somewhat cheerful" although he

"continues with some tearful moments while retelling of bus accident[ ] events" and Ms. Klauber

recommended that he begin seeing her on a monthly basis.  Id. at ECF p. 11-12.  On February 25,

2012, Ms. Klauber reported that she recommended bi-monthly appointments "due to Mr.

Cyrkl[e]r['s] increased anxiety, particularly when driving, expressed fear and concern of

physical limitation, this continues to trigger anxiety."  Id. at ECF p. 14.  Mr. Cyrkler saw Ms.

Klauber five more times between March and April 2012.  Id. at ECF p. 14-15.  Then, on May 4,

2012, Ms. Klauber wrote that Mr. Cyrkler "appears cheerful, discussed and reinforced techniques

of relaxation and cop[ ]ing strategies.  Mr. [Cyrkler] feels ready to terminate treatment for PTSD

at this point.  Treatment terminated as of today."  Id. at ECF p. 15.  When evaluated by Dr. Fried

on June 12, 2015, Mr. Cyrkler reported that he still has weekly nightmares "that he is looking for

his wife after the accident, as she has died" and that "[h]e cannot get this out of his head."  Dkt.

No. 50-2 at ECF p. 7.  Mr. Cyrkler reported to Dr. Fried that "[a]s a result of his poor sleep, he

feels washed out and fatigued all day."  Id.  Although Mr. Cyrkler testified that he has discussed

---

[11]     I note that Ms. Klauber's records are not sworn or accompanied by an affidavit.  I also note that licensed clinical social workers are not specifically covered under Rule 2106 of the New York Civil Practice Law and Rules.  See N.Y. C.P.L.R. 2106 (McKinney).  Cf. Evans v. United States, 978 F. Supp. 2d 148 (E.D.N.Y. 2013) ("unlike a physician's affirmation, an affirmation from a chiropractor is not admissible unless the chiropractor first appears before a notary or other such official and formally declares the truth of the contents of the document") (citations and alteration omitted).

returning to psychological treatment, there is no evidence that he has done so.  Dkt. No. 45-4 at 33:24-37:9.

"PTSD may constitute [a serious] injury when it is causally related to a motor vehicle accident and demonstrated by objective medical evidence."  Krivit v. Pitula, 912 N.Y.S.2d 789, 790 (N.Y. App. Div. 2010).  Defendant argues that Mr. Cyrkler's "complaints and symptoms (nightmares and fear of riding in a car in the rain) fail to even come close to meeting the criteria for post-traumatic stress disorder, or even to rise to the level of a serious psychological injury." Dkt. No. 45-1 at ECF p. 13.  In response, plaintiff argues that "Defendant has presented no evidence to bring into question Ms. Klauber's clinical diagnosis" and that "over two dozen sessions of psychological therapy would appear to demonstrate on its face a serious psychological injury for an individual who had never previously undergone psychological therapy in the past."  Dkt. No. 47 at ECF p. 6 n.1 (emphasis omitted).

I find that there is insufficient record evidence to raise a material question of fact as to whether Mr. Cyrkler suffered emotional injuries which were permanent and consequential or significantly limiting within the meaning of the New York Insurance Law.  There is no testimony from Mr. Cyrkler that, as a result of his emotional status, his daily activities were significantly impaired after the accident.  Further, even if Ms. Klauber's reports were not required to be sworn or accompanied by an affidavit, they are not enough to support Mr. Cyrkler's claim that he suffered a permanent and consequential or significantly limiting mental injury.  Although she diagnosed Mr. Cyrkler with PTSD, saw him on numerous occasions between September 2011 and May 2012, and her treatment records reflect that Mr. Cyrkler expressed anxiety and fear following the accident, her records also demonstrate that Mr. Cyrkler improved with treatment, and ultimately decided that he was ready to terminate treatment.  Ms. Klauber's records do not

provide objective support for a finding that Mr. Cyrkler was <u>significantly</u> limited in his life

activities by his psychological diagnosis.  Nor does the unsworn evaluation of Dr. Fried.[12]  <u>See</u>

<u>Sellitto v. Casey</u>, 702 N.Y.S.2d 177, 180 (N.Y. App. Div. 2000) (finding affidavit of

psychologist who averred that the "plaintiff experienced symptoms such as disturbed sleep cycle

and flashbacks which significantly affected her lifestyle, causing her to reduce her driving and

become socially isolated" "fail[ed] to provide that objectively measured quantum of evidence

necessary to" show a significant limitation of use of a body function or system); <u>cf.</u> <u>Cowan v.</u>

<u>Fish</u>, 784 N.Y.S.2d 919 (N.Y. Sup. Ct. 2004) (finding the "plaintiff has sufficiently raised an

issue of fact as to whether, as a result of PTSD, she has sustained a significant limitation of use

of a body function or system" where notes from her treating psychologist "demonstrate[d] a

multitude of functional impairments plaintiff has suffered, especially with regard to her

relationships with her husband, child, family and friends").

### 2.      Permanent or Significant Injuries:  Irena Cyrkler

#### a.      Physical Injuries

Mrs. Cyrkler seeks to recover damages for physical injuries to her cervical and lumbar

spine.  <u>See</u> Dkt. No. 45-4 at ECF p. 22.  Defendant argues that "Mrs. Cyrkler is almost 60 years-

old and has worked a physically demanding job her entire adult life."  Dkt. No. 45-1 at ECF p.

15.  Defendant contends that, like Mr. Cyrkler, "Mrs. Cyrkler also had pre-existing degenerative

back conditions that were consistent with her age and her profession."  <u>Id.</u> at ECF p. 16-17.

Defendant asserts that "[t]here is no evidence from a treating physician that Mrs. Cyrkler has any

permanent limitations or restrictions as a result of the accident."  <u>Id.</u> at ECF p. 16.

---

[12]      As defendant argues in its August 24, 2014 response to plaintiff's supplemental
exhibits, Dr. Fried's curriculum vitae is silent about any training or experience he has in treating
psychological issues.

Mrs. Cyrkler testified that she did not seek treatment at the hospital immediately following the accident.  Dkt. No. 45-5 at 39:1-4.  She explained that "[i]n two days, my daughter was getting married, and I could stand, so I didn't feel like anything was broken.  And . . . I wanted to attend my daughter's wedding.  Therefore I didn't seek assistance at the hospital."  Id. at 39:10-16.  Plaintiff testified that she saw Dr. Kwapniewski on the Friday following the accident where she "received some pain medication and got referrals."  Id. at 19:7-10.  She has not, however supplied the Court with any medical records of this visit.

An August 19, 2011 CT of Mrs. Cyrkler's spine showed "degenerative disc disease with discogenic endplate sclerosis and asymmetric degenerative hypertrophy of the right uncinate process" at the C3-4 level.  Dkt. No. 48-7 at ECF p. 3.  Also, "[a]t the C4-5 level there is advanced disc degeneration with diffuse posterior endplate ridging" and "mild degree of degenerative osseous foraminal encroachment on right."  Id. at ECF p. 4.  "A similar pattern of advanced degenerative disc disease" was exhibited at the C5-6 level.  Id.  The scan "impl[ied] disc herniation at this level," although "disc herniation proper [was] not visualized."  Id.  "At the C6-7 level advanced disc degeneration with diffuse posterior endplate ridging-annular bulge [were] evident."  Id.  The reviewing radiologist concluded that the CT scan showed, inter alia, "[a]dvanced multilevel degenerative disc disease throughout the C3-7 segment."  Id.  Noting "[a]symmetry . . . characterized by slight rotation of C1 on 2," he concluded that "[a]lthough the degree of rotary subluxation may be on the basis of degenerative change and ligament laxity, post-traumatic etiology cannot be excluded.  Further evaluation with MRI is advised for associated post-traumatic marrow edema or central canal content injury."  Id.  He also concluded that "disc herniation proper is not visualized on CT and this could be elicited with MRI, if warranted."  Id.  Imaging on September 12, 2011 showed "[n]o evidence of fracture/dislocation,

marrow replacing process or intraspinal/paraspinous mass." Dkt. No. 48-8 at ECF p. 2. There was also "[n]o evidence of cervical cord compression, expansion or internal signal aberration at any level." Id. The reviewing doctor found "[s]traightening of normal cervical lordosis perhaps due to some muscular spasm" and "[d]isc degeneration" at C3-4, C4-5 and C6-7. Id.

On October 5, 2011, Mrs. Cyrkler saw Dr. Arthur C. Rothman for a neurological consultation. Id. at ECF p. 4. She reported that while "a course of physical therapy was recommended[, ] she ha[d] not yet begun this treatment." Id. at ECF p. 5. On examination, Dr. Rothman found that Mrs. Cyrkler's "[c]ervical spine range of motion is decreased in all directions. There is bilateral cervical paraspinal tenderness to palpation." Id. Relevant to Mrs. Cyrkler's claimed physical injuries in this case, Dr. Rothman explained that her "clinical presentation is most consistent with bilateral C5 and/or C6 radiculopathies; disc herniations at C3-4, C4-5 and C6-7 with a disc bulge at C5-6; [and] a persistent lumbosacral sprain . . . ." Id. Dr. Rothman concluded that Mrs. Cyrkler's "complaints are causally related to this accident." Id. at ECF p. 3. He recommended "a course of physical therapy for the patient's cervical and lumbar pain" and ordered "electrodiagnostic studies of the bilateral upper extremities with the associated paraspinal muscles" to "help delineate the specific neurological pathophysiology of her injuries." Id. Mrs. Cyrkler underwent the prescribed electrodiagnostic study on October 19, 2011 and Dr. Rothman reported that the results were "normal." Id. at ECF p. 11. Although he lacked copies of Mrs. Cyrkler's prior MRI and CT scans for review, Dr. Rothman concluded that Mrs. Cyrkler had "right sided-C5 and left-sided C6-7 radiculopathies as a result of the traumatic herniated discs seen on the MRI scan of the cervical spine." Id. He concluded that "[t]hese radiculopathies are, more likely than not, the result of her motor vehicle accident of August 3, 2011." Id. Dr. Rothman wrote that his "diagnoses were made on the basis of her clinical

presentation, including symptoms, objective findings on examination, and MRI studies.  Given

the lack of any pre-existing problems, I can only conclude that these problems arose following

the motor vehicle accident."  Id.

On October 26, 2011, Mrs. Cyrkler had another MRI of her lumbar spine.  The MRI

showed "[b]road-based right herniated disc at L4-5 abutting the right L4 nerve root," an

"[a]nnulus tear of the disc at L5-S1" and a "[b]ulge of the disc at L3-4."  Id. at ECF p. 19.  Mrs.

Cyrkler was examined by Dr. Steven P. Waldman on January 12, 2012.  Id. at ECF p. 22.  He

diagnosed her as having "[e]xacerbation of previously asymptomatic cervical spondylosis and

degenerative disc disease with herniation C4-5 and C6-7, multi level bulges, a protrusion or

herniation affecting the right C4 nerve root, lumbar herniation at L4-5 on the right affecting the

right L4 nerve root associated with lumbar L4-5 and S1 radiculopathy, annular tear at L5-S1 with

a bulge at L3-4 with intractable cervicogenic and lumbar discogenic mechanical and radicular

pain."  Id. at ECF p. 23.  Dr. Waldman recommended epidural steroid infusions.  Id.

Mrs. Cyrkler received lumbar epidural steroid infusions on February 7, 2012, Dkt. No.

48-9 at ECF p. 2, and February 14, 2012.  Id. at ECF p. 3.  She saw Dr. Waldman on February

23, 2012 and he reported that "[s]he has experienced near resolution of her neck pain" following

the steroid epidurals.  Id. at ECF p. 8.  He recommended further epidural treatment, id. and she

received a cervical epidural steroid infusion on May 1, 2012.  Id. at ECF p. 10.  On May 10,

2012, Mrs. Cyrkler saw Dr. Waldman again.  He reported that Mrs. Cyrkler

> indicat[e]d that she got good relief with the radicular component of
> her lower extremity pain, but continues to have significant right
> sided pain at approximately the L4-5 or L5-S1 facet level worse on
> extension and right side bending with rotation causing significant
> radiating pain into the right buttock but without new or evolving
> neurologic findings in the lower extremities.

Id. at ECF p. 13.

Mrs. Cyrkler received a right L4-5 facet block on May 22, 2012 and a Right L5-S1 facet block on May 29, 2012.  Id. at ECF p. 15; Dkt. No. 48-10 at ECF p. 2.  On June 14, 2012, Dr. Waldman reported that Mrs. Cyrkler

> obtained tremendous relief from the right L4-5 block, minimal
> relief from the right L5-S1 block and to this day still has almost
> one month later 80 or 90 percent pain relief from the right L4-5
> facet block.  On examination there are no new or evolving
> neurologic findings.  Her range of motion is improved.  She has a
> smile on her face.

Dkt. No. 45-5 at ECF p. 2.  He expected to release Mrs. Cyrkler from treatment in six to eight weeks.  Id.  Plaintiff asserts that "[s]ince her June 14, 2012 appointment, Mrs. Cyrkler has not returned to see either Dr. Rothman or Dr. Waldman due to her lack of insurance and inability to pay."[13]  Dkt. No. 47 at ECF p. 10.  However, attached to defendant's motion (which was filed prior to plaintiff's assertion of this so-called "undisputed fact") is a record of Mrs. Cyrkler's September 13, 2012 visit to Dr. Waldman, who reported that Mrs. Cyrkler "has reached the point of maximum medical improvement and has essentially finished with her interventional pain management course of care."  Id. at ECF p. 3.  He wrote that

> [s]he has no neck or low back pain today.  She feels well, has a
> smile and indicates that she got significant relief from her right
> sided L5-S1 and L4-5 facet blocks with approximately 50 percent
> relief from each one of the procedures now having an improved
> range of motion and minimal tenderness with no new or evolving
> neurologic findings.

Id.

---

[13]     Plaintiffs argue that Mrs. Cyrkler has incurred an economic loss in excess of $50,000 as a result of the injuries she incurred in the bus accident, Dkt. No. 47 at ECF p. 10, and that "she continues to owe different providers in excess of $30,000 for medical treatment after exhausting the New York statutory $50,000 requirement."  Id. at ECF p. 25.  She contends that "Defendant cut off payment of her medical bills . . . until approximately two months" prior to June 2015, and that as a result she did not have adequate funds to obtain additional medical treatment because she did not have insurance.  Id.  She contends that this explains why she had a gap in treatment which was "the same as that of her husband."  Id.

In addition to the treatment above, in an unsworn letter dated December 23, 2014, Glenn Collazo, D.C.,[14] wrote that Mrs. Cyrkler received physical therapy at Haveron Total Health, with an initial office visit on October 8, 2011.  Dkt. No. 48-12.  Dr. Collazo wrote that Mrs. Cyrkler "was started on an conservative course of chiropractic care" and "instructed on the proper biomechanics to perform her every day, daily activities . . . ."  Id. at ECF p. 3.  She received "only mild results" after a "conservative course of chiropractic treatment."  Id.  The letter includes a table which summarizes Mrs. Cyrkler's range of motion results at her initial exam and her final exam as compared to normal.  Id.  However, the letter does not specify the types of testing which were administered to obtain the final identified range of motion results and no date is provided for her final examination.  Id.  Mrs. Cyrkler testified that she went to physical therapy "in Harrison" for "about six, seven months."  Dkt. No. 45-5 at 26:5-7.  She also testified that she stopped physical therapy "[b]ecause I felt better."  Id. at 26:8-10.  Dr. Collazo wrote that it was his "opinion that there is a direct causal relationship between Mrs. Cyrkler's . . . injuries, restrictions and life style alterations and the accident of 8/3/2011."  Id. at ECF p. 4.  He concluded that "Mrs. Cyrkler has sustained a permanent limitation in the normal use of her cervical and lumbar spine and will continue to experience pain, spasm and limitation of these areas on a permanent basis" with a "poor" prognosis for significant improvement.  Id.

Asked at her April 29, 2014 deposition whether she was still having difficulty as a result of her injuries, Mrs. Cyrkler testified that she "think[s] that my occasional back pain is the result

---

[14]     The letter states that Mrs. Cyrkler was involved in a bus accident "in Pennsylvania," apparently refers in error to an "MVA [(motor vehicle accident)] of 5/28/12" and does not state whether Dr. Collazo was Mrs. Cyrkler's treating chiropractor.  See Dkt. No. 48-12.  Although the letter states that it is based on "any and all office notes, test results, examination and treatment reports, and any other materials regarding the patient's care that were available to us at the time of preparation,"  Id. at 4, plaintiffs have not submitted any of the underlying records of Mrs. Cyrkler's chiropractic treatment with their motion.

of the accident" and that she takes over the counter pain medication to address the pain.  Dkt.

No. 45-5, at 31:10-23.  Then, on June 12, 2015, like her husband, Mrs. Cyrkler was evaluated by

Dr. Guy W. Fried.  Dkt. No. 50-1.  Upon examination, Dr. Fried found that Mrs. Cyrkler "had

paraspinal spasm which is palpable in the cervical and lumbar region" and "[h]er strength was

diminished with pain especially in the right lateral hand and foot."  Dkt. No. 50-1 at ECF p. 7.

According to Dr. Fried, she "has moderately decreased range of cervical and lumbar range of

motion.  She could flex her cervical spine to 20 degrees, extend to 30 degrees, lateral tilt 30

degrees on each side and rotate to 50 degrees."  Id.  He explains that  "[n]ormal cervical range of

motion allows flexion to 30 degrees, extension to 60 degrees, lateral tilt to 45 degrees and

rotation to 80 degrees."  Id.  Dr. Fried concluded that Mrs. Cyrkler "has quantified, decreased

cervical and lumbar range of motion with significant spasm" and that "[a]s the patient's injury

has been close to four years ago I would consider it permanent."  Id. at ECF p. 8.

 First, I note that here too, there is a question as to whether plaintiffs have set forth any

evidence which would be competent to demonstrate that Mrs. Cyrkler's injuries are serious.  See

Evans v. United States, 978 F. Supp. 2d 148, 163 (E.D.N.Y. 2013) (finding "unsworn letters or

medical reports from physicians . . . are inadmissible evidence that may not be considered" on

summary judgment); Robinson v. United States, No. 02-5166, 2005 WL 747039, at *6 (S.D.N.Y.

Mar. 31, 2005) ("unsworn medical reports are not a form of admissible evidence capable of

demonstrating a serious injury"); Molina v. United States, 301 F. Supp. 2d 317, 321 (S.D.N.Y.

2004) (finding evidence of bulging discs was inadmissible where it was "based upon an unsworn

report from a doctor").  Further, even if I could consider as competent the evidence which

plaintiffs have submitted to the Court, it is not sufficient to raise a material question of fact as to

whether, as a result of the accident, Mrs. Cyrkler suffered a physical injury which was permanent

and consequential or which resulted in a significant limitation of use.  The conclusions that Mrs.

Cyrkler's injury is "permanent," Dkt. No. 48-12 at ECF p. 4; Dkt. No. 50-1 at ECF p. 8, by Dr.

Collazo, the chiropractor, and Dr. Fried, who was not her treating physician, are not enough.  See

Nasrallah v. Helio De, No. 96-8727, 1998 WL 152568, at *7 (S.D.N.Y. Apr. 2, 1998) ("a

plaintiff's physician's conclusory statements as to significance or permanence, unsupported by

facts detailing the extent of the limitation, is insufficient").  Indeed, shortly after the accident

Mrs. Cyrkler's MRI results showed that she suffered from "advanced" disc degeneration.  Dkt.

No. 48-7 at ECF p. 4.  Although Dr. Collazo notes that Mrs. Cyrkler "reported at the initial

evaluation that she had 'No pain' at the time just prior to the bus accident," nowhere does he

reference the MRI findings of "advanced" disc degeneration.  Dkt. No. 48-12 at ECF p. 2.  See

Arroyo v. Morris, 926 N.Y.S.2d 488, 489-90 (N.Y. App. Div. 2011) (experts' failure to reference

either plaintiff's degenerative or chronic condition made their opinion on causation

"speculative").  Dr. Fried's report mentions disc degeneration (but omits the "advanced"

descriptor).  He does not, however, explain how he ruled out Mrs. Cyrkler's preexisting disc

degeneration as the cause of her complaints.  See Green v. Jones, 19 N.Y.S.3d 514, 515-16 (N.Y.

App. Div. 2015) (finding plaintiff failed to raise a triable issue of fact because "none of her

medical experts addressed or explained the finding of preexisting degeneration present in

plaintiff's own medical records").

　　　　Moreover, "[i]t is well settled that to prove a permanent consequential limitation or

significant limitation of use, a plaintiff must demonstrate something more than . . . a minor, mild

or slight limitation of use."  DeJesus v. Rafael, No. 00-5137, 2003 WL 21305358, at *2

(S.D.N.Y. June 5, 2003) (citations and internal quotation omitted).  An electrodiagnostic study of

Mrs. Cyrkler's spine offered "normal" results.  Dkt. No. 48-8 at ECF p. 11.  Subsequently, Mrs.

Cyrkler's treating physician found that she "ha[d] essentially finished with her interventional

pain management course of care" in September 2012, because she "ha[d] no neck or low back

pain" and "feels well, has a smile, and indicates that she received significant relief from her right

sided L5-S1 and L4-5 facet blocks with approximately 50 percent relief from each one of the

procedures now having an improved range of motion and minimal tenderness with no new or

evolving neurologic findings."  Dkt. No. 45-5 at ECF p. 3.  As defendant argues, the undated

"final" range of motion results in Dr. Collazo's report show that "Mrs. Cyrkler's largest

limitation was just 10% and 10 out of the 12 range of motion studies were either normal or

within 5% of normal."  Dkt. No. 49 at ECF p. 9.  The range of motion results in Dr. Fried's

report, Dkt. No. 50-1 at ECF p. 7, are not far out of range from those reported by Dr. Collazo and

his report lacks any detail with respect to how the measurements were taken.  Mrs. Cyrkler's

own words are more telling:  consistent with Dr. Waldman's final report of treatment, she

testified that she stopped physical therapy "[b]ecause I felt better."  Dkt. No. 45-5 at 26:8-10.

On the record before me, I find that plaintiffs have not set forth sufficient evidence for a jury to

find that Mrs. Cyrkler sustained a physical injury from the August 2011 bus accident which is

either permanent and consequential or significantly limiting within the meaning of § 5102(d) of

the New York Insurance Law.

### b.    Mental Injuries:  Irena Cyrkler

Like her husband, Mrs. Cyrkler also claims that she has "felt upset and depressed since

this crash" and that a "psychotherapist has diagnosed [her] with post traumatic stress disorder as

a result of the crash."  Dkt. No. 45-4 at ECF p. 22.  Defendant argues that Mrs. Cyrkler's

psychological complaints "fail to rise to the level of post-traumatic stress disorder, or even

serious psychological injury."  Dkt. No. 45-1 at ECF p. 17.

Mrs. Cyrkler testified that she saw a psychologist for "[a]bout six, seven months," Dkt. No. 45-5 at 27:1-4, and that, like Mr. Cyrkler she has nightmares and is "afraid of the rain" and "afraid to ride in a car." Id. at 33:8-12; 34:19-20. As for Mr. Cyrkler, Mrs. Cyrkler's "psychologist" was Alicja Krzych Klauber, a licensed clinical social worker. [15]  Handwritten notes from September 1, 2011 indicate that Mrs. Cyrkler had a "PTSD diag." Dkt. No. 48-13 at ECF p. 6. By April 12, 2012, Ms. Klauber reported that Mrs. Cyrkler "continues to respond positively to treatment. Less ruminating thoughts, more able to detract and change patterns of thinking when fearful thoughts intrude. . . . Reports less anxiety while passenger in car." Id. at ECF p. 14. On May 6, 2012, Ms. Klauber wrote that Mrs. Cyrkler "appears cheerful, . . . feels ready to terminate treatment for PTSD at this point. Plans to take car driving lessons. Treatment terminated as of today." Id. Mrs. Cyrkler testified that she was "sure [Ms. Klauber] helped me" and that she had not seen anyone else for psychological help. Dkt. No. 45-5 at 35:3-5. On further questioning, however, she testified that "I felt that I was feeling better, but it wasn't exactly that. To this day, I feel I could use some help." Id. at 40:11-13. Asked why she had not resumed psychological treatment, she said "[t]he reason is lack of money." Id. at 40:14-19.

When she was evaluated by Dr. Fried on June 12, 2015, Mrs. Cyrkler reported that "[a]bout every three weeks[ ] she has nightmares. In her nightmares she is always falling." Dkt. No. 50-1 at ECF p. 6. Dr. Fried wrote that "[s]he was seeing psychotherapy [sic]. She is just now trying to put it behind her and move forward with her life. She doesn't want to think about it. She doesn't want to talk about it." Id. He concluded that Mrs. Cyrkler "would benefit from counseling to help reduce some of the symptoms from the post traumatic anxiety and depression." Id. at ECF p. 8.

---

[15]     Ms. Klauber's records of her visits with Mrs. Cyrkler are not sworn or accompanied by an affidavit. Dkt. No. 48-13 at ECF p. 6-14.

I find that there is insufficient record evidence to raise a material question of fact as to whether Mrs. Cyrkler suffered emotional injuries which were permanent and consequential or significantly limiting within the meaning of the New York Insurance Law.  In particular, there is no evidence that Mrs. Cyrkler's claimed psychological injury has impeded her from performing her ordinary functions in a consequential or significant way.  For example, as defendant contends, there is no "evidence that her alleged nightmares and fear of 'riding in a car in the rain' ever prevented her from actually riding in the car in rain." Dkt. No. 45-1 at ECF p. 18.  As with Mr. Cyrkler, Mrs. Cyrkler's treatment records reflect that her fear and anxiety improved with treatment and the passage of time.  Ms. Klauber's finding that Mrs. Cyrkler felt "cheerful," combined with Mrs. Cyrkler's testimony that she was helped by the treatment she received and that she was feeling better" are inconsistent with her claim that she only stopped psychological treatment because of "lack of money."  I find that there is insufficient objective support in her treatment records or in the unsworn evaluation of Dr. Fried to permit me to find that Mrs. Cyrkler was <u>significantly</u> limited in her life activities by her diagnosed PTSD.

### 3.     90/180 Day Injuries

Defendant asserts that in addition to not being able to prove they suffered permanent or significant physical or mental injuries, neither Mr. Cyrkler nor Mrs. Cyrkler have shown that they can meet the threshold under the 90/180 day rule.  Defendant asserts that "[w]hile Mr. Cyrkler states that he was unable to return to work for six months, he has provided medical excuses for his absence from work for less than three weeks between August 3, 2011 and October 23, 2011." Dkt. No. 45-1 at ECF p. 14.  Defendant contends that Mr. Cyrkler "has provided absolutely nothing to substantiate his claim that he remained out of work past that point and no doctor recommended that he be out of work past that point." <u>Id.</u>  As for Mrs. Cyrkler,

defendant argues that "no doctor ever restricted Mrs. Cyrkler's activities" and that, "although she testified that she did miss approximately two months of work because she 'didn't feel well enough to work so hard,' she has, however, since returned to her independent contractor job as a house cleaner. Dkt. No. 45-1 at ECF p. 17, citing Dkt. No. 45-5 at 31:3-6; see also Dkt No. 45-5 at 32:5-9. As defendant notes, Dkt. No. 49 at ECF p. 5, plaintiff does not specifically respond to defendant's arguments with respect to the application of the 90/180 day category to either of the plaintiffs' claims.

I agree with defendant that neither plaintiff has met the threshold for application of the 90/180 day category to their claims. "Self-serving statements by a plaintiff are insufficient to establish a serious injury under the 90/180 category." Rivera v. United States, No. 10-5767, 2012 WL 3132667, at *12 (S.D.N.Y. July 31, 2012); see also Vargas v. Tomorrow Travel & Tour, Inc., 904 N.Y.S.2d 248, 250 (N.Y. App. Div. 2010) ("subjective complaints of pain and self-imposed restrictions on her daily activities . . . must be supported by medical evidence to establish the existence of a serious injury"). In particular, Dr. Fried's June 12, 2015 report is insufficient to support a finding that Mr. Cyrkler's injuries are serious under the 90/180 day category as his conclusions with respect to Mr. Cyrkler's ability to work are based only Mr. Cyrkler's representations that, inter alia, "he is doing more 'menial' jobs. . . . He is getting paid less and not receiving the raises that he would have otherwise had. . . . He works fewer hours." Dkt. No. 50-2 at ECF p. 7. "Affirmations of medical professionals based solely on a plaintiff's subjective complaints are . . . lacking in probative value." Sciarrone v. Juliano, No. 13- 5985, 2014 WL 6783712, at *6 (E.D.N.Y. Dec. 2, 2014). Likewise, to the extent that Dr. Fried opines on Mrs. Cyrkler's ability to work, his evaluation is insufficient to support a conclusion that she meets the 90/180 day threshold as he relies only on her own reporting that, inter alia, "she

cannot clean like she used to. . . . She has a great deal of difficulty doing deep cleaning. . . . She estimates that she may make a quarter or half of what she used to make." Dkt. No. 50-1 at ECF p. 6. Regardless of her complaints, Mrs. Cyrkler testified that she returned to work two months after the bus accident. See Rogers v. McLamb, 2006 WL 2734228, at *9 (S.D.N.Y. Sept. 22, 2006) (finding the plaintiff failed to establish serious injury under 90/180 day category where there was "nothing in [the physician's] records indicating that plaintiff's ability to participate in her normal activities was hindered as a result of the injuries, or suggesting that she believed plaintiff should not return to work for an extended period"). Plaintiffs have not met their burden to rebut defendant's showing that they have not suffered statutorily serious injuries under the 90/180 prong.

## III.   Conclusion

Because plaintiffs have not raised a triable issue of fact in opposition to defendant's prima facie showing that neither plaintiff has suffered a serious physical or mental injury within the meaning of Section 5102(d) of the New York Insurance law, I will grant summary judgment in favor of defendant.[16]

An appropriate Order follows.

---

[16]    Because I will grant summary judgment in defendant's favor with respect to the Cyrklers' claims, I need not consider defendants' motion to the extent that it seeks dismissal of plaintiffs' claims for punitive damages. See Dkt. No. 45 at ECF p. 18-22.